# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| **GARY L. SMITH,** | |
| **Plaintiff,** | **No. 14 C 3923** |
| **v.** | |
| **CAROLYN W. COLVIN, Acting Commissioner of Social Security,** | **Magistrate Judge Mary M. Rowland** |
| **Defendant.** | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Gary L. Smith filed this action seeking reversal of the final decision of the Commissioner of Social Security denying his application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act (Act). 42 U.S.C. §§ 405(g), 423 *et seq*. The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c), and have filed cross-motions for summary judgment. For the reasons stated below, the case is remanded for further proceedings consistent with this Opinion.

## I. THE SEQUENTIAL EVALUATION PROCESS

To recover Disability Insurance Benefits (DIB), a claimant must establish that he or she is disabled within the meaning of the Act. *York v. Massanari*, 155 F. Supp.

2d 973, 977 (N.D. Ill. 2001).[1] A person is disabled if he or she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). In determining whether a claimant suffers from a disability, the Commissioner conducts a standard five-step inquiry:

1. Is the claimant presently unemployed?
2. Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least 12 months?
3. Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?
4. Is the claimant unable to perform his or her former occupation?
5. Is the claimant unable to perform any other work?

20 C.F.R. §§ 404.1509, 404.1520; *see Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985). "The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner." *Clifford*, 227 F.3d at 868.

---

[1] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 et seq. The standard for determining DIB is virtually identical to that used for Supplemental Security Income (SSI). *Craft v. Astrue*, 539 F.3d 668, 674 n.6 (7th Cir. 2008) ("Although the Code of Federal Regulations contains separate sections for DIB and SSI, the processes of evaluation are identical in all respects relevant to this case."). Accordingly, this Court cites to both DIB and SSI cases.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB on September 20, 2011, alleging that he became disabled due to a back injury and depression on October 15, 2010. (R. at 62, 146). The claim was initially denied on December 5, 2011 (R. at 65–69) and upon reconsideration on March 5, 2012. (R. at 71–74). Plaintiff filed a request for a hearing on April 17, 2012 (R. at 79–80), and on November 13, 2012, Plaintiff, represented by attorney John E. Horn, testified at a hearing before Administrative Law Judge (ALJ) Roxanne Kelsey (R. at 38–61). The ALJ also heard testimony from Aimee Mowery, a vocational expert (VE).

The ALJ denied Plaintiff's request for benefits on December 14, 2012. (R. at 22–32). Applying the five-step sequential evaluation process, the ALJ found, at step one, that Plaintiff has not engaged in substantial gainful activity since October 15, 2010, the alleged onset date. (R. at 24). At step two, the ALJ found that Plaintiff's lumbar spondylolysis is a severe impairment and that his hypertension, psoriasis, and depression are nonsevere impairments. (R. at 24–26). At step three, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meet or medically equal the severity of any of the listings enumerated in the regulations. (R. at 26).

The ALJ then assessed Plaintiff's residual functional capacity (RFC)[2] and determined that he can perform light work as defined in 20 C.F.R § 404.1567(b) except

---

[2] Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The RFC is the maximum

"he can only occasionally stoop, and he should not be required to drive longer than two hours without a break." (R. at 26). Based on Plaintiff's RFC and the VE's testimony, the ALJ determined at step four that Plaintiff is capable of performing past relevant work as a dispatcher. (R. at 30). Accordingly, the ALJ concluded that Plaintiff has not been under a disability, as defined by the Act, from October 15, 2010, through December 14, 2012, the date of her decision. (R. at 31–32).

The Appeals Council denied Plaintiff's request for review on April 10, 2014. (R. at 1–5). Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561–62 (7th Cir. 2009).

## III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the SSA. In reviewing this decision, the Court may not engage in its own analysis of whether the plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v.*

---

that a claimant can still do despite his mental and physical limitations." *Craft*, 539 F.3d at 675–76.

*Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004); *see Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014) ("We will uphold the ALJ's decision if it is supported by substantial evidence, that is, such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.") (citation omitted). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). "This deferential standard of review is weighted in favor of upholding the ALJ's decision, but it does not mean that we scour the record for supportive evidence or rack our brains for reasons to uphold the ALJ's decision. Rather, the ALJ must identify the relevant evidence and build a 'logical bridge' between that evidence and the ultimate determination." *Moon v. Colvin*, 763 F.3d 718, 721 (7th Cir. 2014). Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

# IV. RELEVANT MEDICAL EVIDENCE

## A. Treating Physicians

Plaintiff was born on July 7, 1954, and was 57 years old when he applied for DIB. (R. at 142). On April 21, 2004, while at work as a truck driver, Plaintiff felt a "pop" in his lower back as he was bending over and pulling on a gas fitting from an underground tank. (R. at 222, 226). On April 28, 2004, Ram Pankaj, M.D., an orthopedic surgeon, examined Plaintiff and found that he had "low back pain secondary to sprained lumbosacral muscle" and "lumbar spondylosis with spondylolisthesis at L5-S1." (R. at 222). Dr. Pankaj recommended Plaintiff stay off work for a week, prescribed Vioxx for the pain and instructed Plaintiff to get a CT scan. (*Id.*). A May 11, 2004 CT scan revealed degenerative disc disease of L5-S1 with Grade I spondylolisthesis, bilateral spondylolysis and moderately severe bilateral foraminal stenosis. Dr. Pankaj referred him to a neurosurgeon. (R. at 221). On May 27, 2004, Lenard Rutkowski, M.D., a neurosurgeon, noted degenerative disc disease with listhesis, and recommended an MRI, physical therapy and possibly surgery, and prescribed Prednisone. (R. at 237).

On June 4, 2004, an MRI of the lumbar spine revealed Grade I spondylolisthesis of L5-S1 with associated spondylosis, moderate bilateral foraminal stenosis, right paracentral disc protrusion, and small diffuse disc bulge. (R. at 223). Plaintiff attended physical therapy in June 2004 at Brightmore Physical Therapy, but noted that it increased his low back pain. (R. at 226, 238–84). On June 29, 2004, John B. Mazur, M.D., a spine surgery specialist, noted Plaintiff was in discomfort and bends

forward when he walks, and reported low back pain and limited range of motion in the low back. He prescribed physical therapy and Norco, and noted he could not work. (R. at 228). At a follow-up visit on July 27, 2004, Dr. Mazur recommended surgical intervention and discontinuing physical therapy because it increased low back pain. (R. at 224–25).

In October 2004, Plaintiff underwent posterior interbody fusion at L4-5 and L5-S1. (R. at 244). Plaintiff was referred to physical therapy following the lumbar fusion. (R. at 259). By June 9, 2005, Plaintiff had no significant improvement in his physical or functional abilities even after he completed the prescribed work conditioning program; he demonstrated "weakness into the left lower extremity, along with limitations in his lifting ability, and tolerance for static and dynamic work related postures." (R. at 240). On June 13, 2005, Plaintiff was released to work with restrictions: "okay to drive, but limit driving to two hours at one time, [can] lift max 40 pounds, occasional[ly] lift from height no lower than 24 inches from floor, carry max 30 pounds occasional." (R. at 242, 249). On June 4, 2007, Edward J. Goldberg, M.D., of Midwest Orthopedics, examined Plaintiff following a car accident on May 23, 2007, where he developed neck and lower back pain. (R. at 244). Dr. Goldberg opined that Plaintiff had cervical and lumbar strain from the motor vehicle accident but could continue to work. He did not prescribe medication. (*Id.*).

On January 18, 2010, Plaintiff had an initial evaluation at Riverside Medical Center and was diagnosed with benign essential hypertension. (R. at 349–53). On February 17, 2011, Plaintiff had a general exam with Riverside. (R. at 347). In a vis-

it to Riverside on February 16, 2012, Plaintiff was instructed to continue Hydrocodone and Diltiazem; reported improved back and right buttock pain but takes Vicodin before sleep. (R. at 340). During a visit on May 17, 2012, Plaintiff reported pain to be a 6 in the lower back. (R. at 337). On October 24, 2012, Plaintiff returned to Riverside complaining of back pain that was chronic and persistent, with not much relief from the previously prescribed Gabapentin. (R. at 359). He was prescribed Lidoderm. (*Id.*).

## B. Consultative and Nonexamining State Agency Doctors

On October 25, 2011, Plaintiff had a consultative examination with Sarat Yalamanchili, M.D., an internist. Dr. Yalamanchili noted the straight leg raising test was impaired because of low back pain and Plaintiff had mild difficulties getting on and off the exam table, walking on heels, and hopping on one leg. (R. 297–98). He noted low back pain if he exerts too much; he was unable to walk long distances or during long periods of time; and his range of motion of the lumbar spine and hip joints were impaired. (R. at 300).

On November 28, 2011, Richard X. Smith, a State agency medical consultant, conducted a physical RFC assessment and found Plaintiff able to occasionally lift 20 pounds, frequently lift and carry ten pounds, able to stand or walk a total of six hours, and sit for a total of six hours within an eight hour workday. (R. 323–30). The RFC assessment also indicated postural limitations with occasional kneeling, but otherwise, Plaintiff did not have manipulative, visual, communicative, or environmental limitations. (*Id.*).

With regards to Plaintiff's mental impairments, on October 25, 2011, Erwin Baukus, Ph.D., a clinical psychologist, conducted a psychological consultative examination. (R. at 304-08). Plaintiff reported symptoms of depression. (R. at 305). Specifically, he reported sleep disturbance, decreased energy, feelings of worthlessness, pervasive loss of interest in almost all activities, and appetite disturbance with a 40-pound weight loss. *Id.* He was diagnosed with adjustment disorder with pain and depressed mood. (R. at 307).

Joseph Cools, Ph.D., completed a psychiatric review on November 7, 2011. (R. at 309–22). Though he diagnosed Plaintiff with affective disorders, he also found the impairments "not severe" and noted Plaintiff did not have perceivable functional limitations. (R. at 309–19). Dr. Cools found that Plaintiff was only limited due to physical problems and that the psychiatric issues were not substantially limiting. (R. at 321).

## C. Plaintiff's Testimony

Plaintiff worked as a trucker and vehicle dispatcher with a trucking company until October 15, 2010, when the company went out of business. (R. at 147, 169). During his employment, Plaintiff was afforded accommodations and allowed to walk around for ten minutes to stretch every two hours. (R. at 41).

Plaintiff testified that he has pain in his lower back, and reported his pain to be anywhere from a six-and-a-half to seven on a scale of ten. (R. at 47). He described the pain as being steady; he wakes up and walks around for 10 to 15 minutes at night; and it is difficult to move around four days a week and he can sit for only an

hour and a half or two hours before having to stand up. (R. at 47). He can stand up for 10–15 minutes; and he can walk for 10–15 minutes. (R. at 48).

Plaintiff lives with his parents and helps with household chores when he can; he does not do his own laundry because he cannot lift the laundry soap; he sometimes struggles with lifting a gallon of milk; and, although he drives, Plaintiff has problems sitting in the car for an extended period of time. (R. at 42–43). Plaintiff does not have any hobbies; he watches television once in a while but cannot follow sports games because he is often sidetracked and will get up and move around. (R. at 44–45). Medication helps sometimes; he was taking Vioxx, Vicodin, and Gabapentin, but is no longer taking them because they made him either drowsy or were ineffective. He currently takes over-the-counter pain medications and uses a pain patch to cope with the pain. (R. at 46–47, 52).

In an October 2011 Function Report, Plaintiff indicates he cannot walk very long before having to rest due to the lower back. (R. at 180–81). In a disability report completed on April 18, 2012, he indicates that his daily activities are restricted: "I doze off/nap 3x per week for 15–20 minutes at a time. I have to [continually] move positions or get up and move around due to pain and stiffness." (R. at 207).

On October 10, 2011, in a third party function report, Cathy Dorch, Plaintiff's sister, noted that he "cannot stand or sit for extended periods of time. Cannot lift any weight over 5 [pounds] cannot stoop or bend over." (R. at 158). He sleeps very little and has to get up and walk a little at night; he doesn't prepare his own meals; he has constant pain in his lower back; he can sit, stand, or walk for only 15–20

minutes at a time; he avoids stairs, squatting, and bending; and he can walk only one block before needing to stop and rest. (R. at 157–65).

# V. DISCUSSION

Plaintiff argues that the ALJ: (1) improperly assessed his credibility; (2) incorrectly assessed the RFC; and (3) failed to properly assess Plaintiff's past relevant work.

## A. The ALJ's Credibility Finding is Patently Wrong

Plaintiff argues that the ALJ erred in his credibility determination. An ALJ's credibility determination may be overturned only if it is "patently wrong." *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008). In determining credibility, "an ALJ must consider several factors, including the claimant's daily activities, her level of pain or symptoms, aggravating factors, medication, treatment, and limitations, and justify the finding with specific reasons." *Villano*, 556 F.3d at 562 (citations omitted); *see* 20 C.F.R. § 404.1529(c); Social Security Ruling (SSR)[3] 96-7p. An ALJ may not discredit a claimant's testimony about her symptoms "solely because there is no objective medical evidence supporting it." *Villano*, 556 F.3d at 562 (citing SSR 96-7p; 20 C.F.R. § 404.1529(c)(2)); *see Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006) ("[T]he administrative law judge cannot disbelieve [the claimant's] testimony solely

---

[3] SSRs "are interpretive rules intended to offer guidance to agency adjudicators. While they do not have the force of law or properly promulgated notice and comment regulations, the agency makes SSRs binding on all components of the Social Security Administration." *Nelson v. Apfel*, 210 F.3d 799, 803 (7th Cir. 2000); *see* 20 C.F.R. § 402.35(b)(1). While the Court is "not invariably *bound* by an agency's policy statements," the Court "generally defer[s] to an agency's interpretations of the legal regime it is charged with administrating." *Liskowitz v. Astrue*, 559 F.3d 736, 744 (7th Cir. 2009).

because it seems in excess of the 'objective' medical testimony."). Even if a claimant's symptoms are not supported directly by the medical evidence, the ALJ may not ignore circumstantial evidence, medical or lay, which does support a claimant's credibility. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539–40 (7th Cir. 2003). Indeed, SSR 96-7p requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) (citation omitted).

The Court will uphold an ALJ's credibility finding if the ALJ gives specific reasons for that finding, supported by substantial evidence. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009). The ALJ's decision "must contain specific reasons for a credibility finding; the ALJ may not simply recite the factors that are described in the regulations." *Steele*, 290 F.3d at 942 (citation omitted); *see* SSR 96-7p. "Without an adequate explanation, neither the applicant nor subsequent reviewers will have a fair sense of how the applicant's testimony is weighed." *Steele*, 290 F.3d at 942.

As an initial matter, Plaintiff contends that the ALJ used meaningless boilerplate language to discredit his statements.[4] This is the language that the Seventh Circuit has repeatedly described as "meaningless boilerplate" because it "yields no

---

[4] "[T]he claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (R. at 27).

clue to what weight the [ALJ] gave the testimony" and fails to link the conclusory statements made with the objective evidence in the record. *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012). "However, the simple fact that an ALJ used boiler-plate language does not automatically undermine or discredit the ALJ's ultimate conclusion if he otherwise points to information that justifies his credibility deter-mination." *Pepper v. Colvin*, 712 F.3d 351, 367–68 (7th Cir. 2013). The Court is not persuaded that the ALJ's use of this boilerplate language is grounds for remand. Rather, the Court finds that the reasons provided by the ALJ for rejecting Plaintiff's credibility are legally insufficient.

Plaintiff testified that he has pain in his lower back; his pain is anywhere from a 6½–7 on a scale of 10; the pain is steady; he wakes up and walks around for 10 to 15 minutes at night; and it is difficult to move around four days a week and he can sit for only an hour and a half or two hours before having to stand up. (R. at 47). He al-so reported that he cannot sit or stand for a long period of time, has difficulty lifting a gallon of milk, cannot stoop or bend, and he has difficulty walking, reaching, climbing stairs and concentrating. (R. at 42–43, 47–48; *see id.* at 27).

The ALJ primarily discounted Plaintiff's reports of pain and limitations because his "medical records demonstrate few reports of back pain and little treatment since the alleged onset date." (R. at 27). The ALJ was troubled that Plaintiff "did not re-port back pain or receive treatment for back pain in visits to his primary care pro-vider in 2010 or 2011." (R. at 28).

The ALJ's findings overlook salient facts. First, during his October 2011 consultative examination, Plaintiff reported back pain: "He gets low back pain on and off depending on the activity, but he has some pain all the time." (R. at 295). Moreover, treatment notes from February, May, and October 2012 all indicate reports of back pain. (R. at 340, 337, 359). The February 16, 2012 notes indicate improving back and right buttock pain; taking Vicodin before sleep; Plaintiff's pain was a 4.5 on the pain scale; Plaintiff had daily, ongoing lower back and right buttock aches; and Plaintiff was prescribed Hydrocodone-Acetaminophen for pain. (R. at 340). On May 17, 2012, Plaintiff requested a refill of Vicodin, reported skin lesions, and requested the physician complete a form for disability for back problems. The physician noted lower back pain, chronic and intermittent, and 6 on a pain scale and the physician recommended Plaintiff consult with his back specialist to complete the disability paperwork. (R. at 338). On October 24, 2012, Plaintiff's chief complaints were chronic and persistent back pain, with not much relief with Gabapentin, and the physician noted intermediate, but chronic "deep" pain in the lower back. (R. at 359). The physician diagnosed lumbago syndrome and hypertension, and prescribed Lidoderm (patch). (R. at 359).

It is true that Plaintiff also visited Riverside Medical Center in January 2010 and February 2011 for general exams and did not complain of back pain.[5] However, the January 2010 appointment was before the alleged onset date of October 15,

---

[5] Moreover, the January 2010 appointment and the February 2011 appointments appear to concern issues unrelated to Plaintiff's back pain, such as hyperlipidemia, lipoid metabolism, benign essential hypertension, and erectile disorder. (R. at 346, 354).

2010. That means that the February 2011 is the only appointment in the record after the alleged onset date where Plaintiff did not complain of back pain to a physician. "An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). In any event, in 4 out of the 5 medical examinations Plaintiff had since his onset date, he complained of back pain.

In addition to overlooking Plaintiff's steady complaints of back pain to his treating physicians, the ALJ disregards two pieces of "objective" medical evidence. The first is the fact that Plaintiff's treating physicians prescribed Hydrocodone-Acetaminophen and Vicodin for back pain. Both drugs are combination medications, which contain a narcotic pain reliever, and are used to relieve moderate to severe pain. Furthermore, the consultative examiner noted that Plaintiff "appeared to be in discomfort during range of motion of lumbar spine, and straight leg test" and that he had mild difficulties getting on and off the exam table, walking on heels, and hopping on one leg. (R. 297–300). The examiner further noted low back pain if Plaintiff exerts too much; Plaintiff unable to walk long distances or over long periods of time; and his range of motion of the lumbar spine and hip joints were impaired. (R. at 300).[6]

---

[6] For the same reason, the ALJ impermissibly disregards the third-party function report provided by Plaintiff's sister, Cathy Dorch, who reported that Plaintiff "cannot stand or sit for extended periods of time. Cannot lift any weight over 5 [pounds] cannot stoop or bend over; he sleeps very little and has to get up and walk a little at night; he doesn't prepare his own meals; he has constant pain in his lower back; he can sit, stand, or walk for about 15-

The ALJ also noted that on two occasions Plaintiff had run out of back pain medication two weeks prior to his medical appointment; in May 2012, the doctor stopped Plaintiff's prescription for Vicodin; and Plaintiff stopped working because his previous employer went out of business, not because of his disability. (R. at 29). The ALJ further notes that the primary care provider declined to fill out forms related to Plaintiff's application for Social Security benefits and advised Plaintiff to consult his previous treating physician. (R. at 28). But it is unclear whether the ALJ relies on these factors in assessing Plaintiff's credibility. In any event, the ALJ fails to connect the dots between Plaintiff's termination based on the business's bankruptcy and her conclusion that Plaintiff is not credible regarding his alleged impairments. In essence, the ALJ does not explain how Plaintiff's termination somehow shows that his alleged symptoms are overstated or contradict his alleged pain. It is equally unclear how the Riverside Health Care physician recommending Plaintiff see his treating specialist about disability forms affect Plaintiff's credibility. The ALJ "must identify the relevant evidence and build a 'logical bridge' between that evidence and the ultimate determination." *Moon*, 763 F.3d at 721.

The ALJ also improperly dismissed Plaintiff's credibility based on his reports of daily activities. Plaintiff testified that he does a little cleaning and some laundry, but only prepares himself simple meals; he helps with washing dishes sometimes

---

20 minutes at a time; he avoids stairs, squatting, and bending; he can walk 1 block before needing to stop and rest." (R. at 157–65). The ALJ found that Dorch's opinions are "not supported by the medical evidence, including the objective findings on examination [of Dr. Yalamanchili's October 25, 2011 consultative examination]." (R. at 30). The ALJ must reevaluate this finding on remand.

but he does not do yard work. (R. at 182). The ALJ noted that Plaintiff "generally reports fairly limited daily activities" and disregarded these reports because the "allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty. (R. at 29).

The ALJ cannot discount Plaintiff's credibility merely because his asserted daily activities cannot be independently verified. *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014) ("Whatever uncertainty may exist around such self-reports is not by itself reason to discount them—otherwise, why ask in the first place?—and the relevant regulations specifically allow ALJs to consider claimants' 'daily activities.'") (citing 20 C.F.R. §§ 404.1529(a), 416.929(a)); *see Buechele v. Colvin*, No. 11 C 4348, 2013 WL 1200611, at *17 (N.D. Ill. Mar. 25, 2013) ("A claimant's statements about his own limitations, however, are naturally subjective, hence the need for the ALJ to make a credibility determination."); SSR 96-7p, at *1 (claimant's testimony about her symptoms "may not be disregarded solely because they are not substantiated by objective medical evidence"). "By the ALJ's reasoning, the agency could ignore applicants' claims of severe pain simply because such subjective states are impossible to verify with complete certainty, yet the law is to the contrary." *Beardsley*, 758 F.3d at 837. In any event, the ALJ's analysis is nonsensical. That Plaintiff's "activities cannot be objectively verified with any reasonable degree of certainty" ignores the fact that Plaintiff's sister reported that he doesn't prepare his own meals; he has constant pain in his lower back; he can sit, stand, or walk for only about 15–20 minutes at a time; he avoids stairs, squatting, and bending; and he can walk only

one block before needing to stop and rest.[7] (R. at 157–65); *see Thomas v. Colvin*, 534 F. App'x 546, 551 (7th Cir. 2013) (described the ALJ's justification as "nonsensical" given that there was corroborating evidence in the record); *Shelley v. Colvin*, No. 13 C 1239, 2014 WL 1653079, at *6 (S.D. Ind. Apr. 23, 2014) ("Shelley's wife's corroborating testimony makes this case nearly identical to *Thomas* and undermines the ALJ's first reason for discounting Mr. Shelley's testimony").

## B. Plaintiff's Past Relevant Work

To determine if a claimant is capable of performing his or her past relevant work, an ALJ must compare the demands of the claimant's past occupation with his or her present capacity. *Strittmatter v. Schweiker*, 729 F.2d 507, 509 (7th Cir. 1984). In defining a claimant's past relevant work, SSR 82-61 and §§ 404.1520(e) and 416.920(e) provide that a claimant will be found to be "not disabled" when it is determined that he or she retains the RFC to perform: (1) the actual functional demands and job duties of a particular past relevant job; or (2) the functional demands and job duties of the occupation as generally required by employers throughout the national economy. *Steward v. Bowen*, 858 F.2d 1295, 1299–300 (7th Cir. 1988).

With regards to past relevant work, Plaintiff argues that his previous role as a dispatcher was performed under special accommodations and therefore does not constitute past relevant work. Specifically, Plaintiff reasons that he was permitted flexibility in his job in that "he was allowed to stand and stretch, walk around the dispatch office as needed, and, if necessary, take additional breaks to reduce/limit

---

[7] As discussed in *supra* note 6, the ALJ improperly rejected Plaintiff's sister's credibility.

back pain. The frequency of such breaks varied daily depending on his level of discomfort/pain." (Pl. Mot. at 12). Citing 20 C.F.R. § 404.1573(c), Plaintiff states that his job as a dispatcher was so accommodational that it does not amount to past work at all. Pursuant to 20 C.F.R. § 404.1573(c):

> The work you are doing may be done under special conditions that take into account your impairment, such as work done in a sheltered workshop or as a patient in a hospital. If your work is done under special conditions, [the agency] may find that it does not show that you have the ability to do substantial gainful activity.

Plaintiff's past position as a dispatcher is described as sedentary work under the Dictionary of Occupational Titles, which was relied upon by the VE during the hearing. *See* 20 C.F.R. § 404.1566. Plaintiff worked eight to eight and a half hours a day, five to six days a week. (R. 49, 202). In the field office disability report dated March 1, 2012, Plaintiff detailed the requirements of his job: he had to walk or stand for less than two hours, sit for six to eight hours, handle items for six to eight hours, reach his microphone for two to three hours, and type for two to three hours. (*Id.*). No lifting or carrying was required. (*Id.*). Plaintiff also noted in his disability report that he was permitted flexibility in his job in that he was allowed to stand, stretch, walk around the dispatch office as needed, and take additional breaks to reduce his back pain. (*Id.*). At the hearing, Plaintiff testified that he would walk around and stretch during breaks. (R. at 50).

At the hearing, the VE provided the Dictionary of Occupational Titles (DOT) number for a dispatcher as 913.387-010, which cannot be found in the database and

is seemingly incorrect. Nevertheless, relying on the DOT description of a Dispatcher of Motor Vehicles, DOT 249.167-014, the responsibilities include:

> Assigns motor vehicles and drivers for conveyance of freight or passengers; Compiles list of available vehicles; Assigns vehicles according to factors, such as length and purpose of trip, freight or passenger requirements, and preference of user; Issues keys, record sheets, and credentials to drivers; Records time of departure, destination, cargo, and expected time of return; Investigates overdue vehicles; Directs activities of drivers, using two-way radio; May confer with customers to expedite or locate missing, misrouted, delayed, or damaged merchandise; May maintain record of mileage, fuel used, repairs made, and other expenses; May establish service or delivery routes; May issue equipment to drivers, such as hand trucks, dollies, and blankets. May assign helpers to drivers.

Pursuant to 20 C.F.R. § 404.1567, sedentary work involves

> lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

Based upon physical exertion alone, this Court understands how the ALJ could have concluded that the physical accommodations required by Plaintiff would not have interfered with his ability to carry out his past work as a dispatcher. By his own testimony, Plaintiff is limited in his ability to sit or stand for a long period of time without pain, but based upon the descriptions above, a sedentary job such as that of a dispatcher would have accommodated for his physical restrictions. However, the ALJ, based on her credibility finding, disregarded Plaintiff's testimony that he was provided with four breaks in his previous job, an accommodation that the VE testified would preclude him from other work. Plaintiff testified this was a re-

quirement for him to carry out his responsibilities as a dispatcher and the ALJ neglected to account for this accommodation. After reevaluating Plaintiff's credibility, the ALJ must reevaluate Plaintiff's testimony about her work accommodations.

## C. Summary

Because the Court is remanding on the credibility issue, the Court chooses not to address Plaintiff's argument that the ALJ erred in her RFC determination. On remand, the ALJ shall reassess Plaintiff's credibility with due regard for the full range of medical evidence. The ALJ shall then reevaluate Plaintiff's physical and mental impairments and RFC, considering all of the evidence of record, including Plaintiff's testimony, and shall explain the basis of her findings in accordance with applicable regulations and rulings. Finally, after reevaluating credibility, the ALJ shall determine whether Plaintiff can perform his past relevant work as accommodated, or if there are jobs that exist in significant numbers that Plaintiff can perform.

## VI. CONCLUSION

For the reasons stated above, Plaintiff's motion for summary judgment [12] is **GRANTED**, and Defendant's Motion for Summary Judgment [20] is **DENIED**. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

E N T E R:

Dated: February 1, 2016

_____
MARY M. ROWLAND
United States Magistrate Judge